IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| United States of America : | |
| : | Case No. CR-1-07-21 |
| : | |
| : | District Judge Susan J. Dlott |
| v. : | |
| : | ORDER DENYING |
| Orlanzo M. Brown : | DEFENDANT'S MOTIONS TO |
| : | SUPPRESS |
| Defendant : | |

This matter comes before the Court on Defendant Orlanzo M. Brown's Motion to Suppress Evidence and Statements (doc. 14) and Supplemental Motion to Suppress Evidence (doc. 19). The Court held a hearing on the motions on May 23, 2007. The matter is now ripe for review. For the reasons that follow, the Court **DENIES** Defendant's motion.

**I.    FACTUAL BACKGROUND**

Brown was arrested on November 26, 2006 and subsequently charged with one count of being a felon in possession of a weapon in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(a)(2). On the night Brown was arrested, Cincinnati Police Officers Jason Bley and Matt Schneider saw Brown's vehicle circling the block around West Eighth Street and Mt. Hope Street in Cincinnati, Ohio. The officers pulled Brown over for a traffic stop after observing him make a left turn without using a turn signal.

At the hearing on Brown's motion to suppress the evidence seized during the stop, both officers testified and the Government introduced into evidence and played in its entirety the

Mobile Video Recording ("MVR") of the stop.[1] Officer Bley testified that he knew the location to be a high crime area based on his discussions with confidential informants. He also stated that the police department has made various drug arrests and has executed several search warrants in or around that location. According to Officer Bley, Brown's act of circling the block was indicative of someone looking to purchase drugs.

After pulling Brown over, Officer Bley approached Brown on the driver's side of the car while Officer Schneider assumed a cover position on the passenger side. Officer Bley testified that Brown appeared nervous and that he was breathing hard. Likewise, Officer Schneider described Brown's breathing as shallow and rapid and believed this was cause for concern based on his experience of conducting roughly a thousand traffic stops over his career.

Officer Bley spoke briefly with Brown about why the officers had stopped him and about what he was doing circling the block. Brown explained that he was looking for a girl's house. Both officers testified that during the initial encounter with Brown, Officer Bley obtained Brown's consent to search his car. However, no such request was recorded by the MVR.[2]

---

[1] The MVR is part of the police cruiser's standard equipment. The system involves two components – an audio and a visual component. The visual component consists of a camera that is mounted in plain view on the windshield of the cruiser. The audio component consists of a microphone attached to the officer's uniform as well as a microphone inside the police cruiser.

The MVR is linked with the flashing lights on the top of the police cruiser, such that switching the lights to certain settings automatically activates the MVR. Specifically, there are three settings for the lights. The first setting points the flashing lights to the rear; the second setting rotates the lights 360 degrees; and the third setting points the lights to the front. Switching the lights to the second or third setting simultaneously activates the MVR.

[2] Recognizing that the sound quality on the video was at times extremely poor, the Court reviewed the recording several times and was unable to discern any request for consent to search Brown's vehicle at that point during the stop.

After retrieving Brown's identification, the officers returned to their police cruiser. Once inside the cruiser, Officer Schneider remarked to Officer Bley that Brown appeared nervous, was sweating a lot, and had one arm out of his coat. Officer Bley performed a license check, which revealed that the Brown's car was registered to him and that there were no outstanding warrants for his arrest. When the officers looked into Brown's criminal history, they discovered that Brown had a history of violent crime and weapons related offenses, the most recent of which was in 1994. Meanwhile, as can be seen on the MVR, Brown turned on the interior overhead light in his car, reached around behind his seat, and appeared to be looking for something in the rear passenger compartment. After switching the light off once, Brown then turned the light back on and proceeded to continue searching for something in the car.

Based on Brown's history and behavior, Officer Schneider advised Officer Bley to tell Brown "Because of your past history with firearms, we would feel better if we could take a look in the car." The officers then approached Brown's vehicle a second time. While the sound on the video is at times unclear, the video does show Officer Bley make an audible request to search Brown's vehicle. According to the officers, after they obtained consent to search the car, Brown stepped out of the vehicle. Officer Bley then asked if Brown had anything illegal on his person and obtained Brown's consent to a pat-down. Officer Bley frisked Brown and found a .45 caliber pistol in Brown's pants. The officers then placed Brown into the back of their police cruiser and Mirandized him. After being read his rights, Brown admitted to placing the firearm down his pants, but claimed that the weapon belonged to an uncle who had recently borrowed his car and that he did not know the weapon was in his car until he called his uncle during the traffic stop.

**II.     ANALYSIS**

Defendant Brown moves the Court to suppress all evidence and statements obtained on the night in question.  The Government responds that the traffic stop, pat down of Defendant, and search of Defendant's vehicle were valid.

**A.     The Initial Stop**

With his Motion to Suppress, Brown contends that the initial stop of his car was invalid because the officers lacked reasonable suspicion that he was committing, had committed, or was about to commit a crime.  Brown further contends that any traffic violations or other actions the officers observed were merely a pretext for pulling Defendant over and conducting a search.  Defendants respond that the initial stop was valid because the Officers had probable cause to believe that Defendant Brown was violating a Cincinnati traffic law when they saw him make a left turn without using his signal.

The Sixth Circuit has repeatedly held that the Fourth Amendment permits officers to stop a vehicle if the officers have probable cause to believe a traffic violation has occurred.  See United States v. Burton, 334 F.3d 514, 516 (6th Cir. 2003) ("The Fourth Amendment . . . permits an officer who has probable cause to believe that a traffic violation is occurring to detain the automobile . . . .." (citing Whren v. United States, 517 U.S. 806, 812-13 (1996))); United States v. Davis, 430 F.3d 345 (6th Cir. 2005) (holding that officers had probable cause to detain a driver for limited purpose of issuing traffic warning after they had observed the driver speeding); United States v. Garrido, 467 F.3d 971, 977 (6th Cir. 2006) (holding that an officer had probable cause to stop a truck because the driver violated a Kentucky statute prohibiting following too closely).

As to the issue of pretext, the Supreme Court has clarified that the "constitutional reasonableness of traffic stops" does not depend "on the actual motivations of the individual officers involved." Whren, 517 U.S. at 813; see also United States v. Townsend, 305 F.3d 537, 541 (6th Cir. 2002) ("A police officer may effect a traffic stop of any motorist for any traffic infraction, even if the officer's true motive is to detect more extensive criminal conduct."). Accordingly, the initial stop did not result in a violation of Brown's constitutional rights.

**B.      The Subsequent Detention and Search**

Brown next argues that even if the initial traffic stop was valid, the subsequent detention and search exceeded the scope and duration permitted by the justification for the initial stop.[3] Accordingly, Brown argues that all statements and evidence seized during the stop are inadmissible. The Government responds that the detention and search of Brown's car were valid because Brown gave consent. Additionally, the Government contends that the officers were justified in patting down Defendant to check for weapons because the officers knew Defendant had been convicted of violent crimes in the past and they observed that Defendant was nervous, sweating, and breathing heavily.

---

[3] Brown also argues that the search violated his constitutional rights because (1) the Government cannot bear the burden of proving that Brown gave consent freely and voluntarily; (2) the Government cannot rely on the plain view doctrine; and (3) the Government cannot rely upon any theory that Brown's own conduct exposed incriminating evidence to the officers' view. Neither of these arguments warrants significant discussion. As to the first argument, the evidence presented at the hearing suggested no reason to question the voluntariness of Brown's consent. As to the latter two arguments, the Government does not rely on the plain view doctrine or on the theory that Brown's own conduct exposed incriminating evidence to the officers' view.

The Sixth Circuit has previously analogized an ordinary traffic stop to an investigative detention. United States v. Perez, 440 F.3d 363, 370 (6th Cir. 2006). An investigative detention is temporary in nature and must last no longer than necessary to effectuate the purpose of the stop. Florida v. Royer, 460 U.S. 491, 500 (1983). Accordingly, it is generally the case that "[o]nce the purpose of [the] traffic stop is completed, the officer may not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention."[4] Perez, 440 F.3d at 370.

In the instant case, the Government bases its prolonged detention of Brown on his consent to the search. Based on the MVR, it does not appear that Officer Bley obtained consent to search Brown's car upon first approaching Brown, as both officers testified. However, it is clear from the MVR that Officer Bley requested consent when he approached the vehicle a second time after running Brown's license. While the sound on the MVR is too unclear to ascertain whether or not Brown actually gave consent, the portions that are audible are consistent with the officers' testimony that Officer Bley obtained consent to search Brown's car at that point. In any case, there is no evidence contradicting the officers' testimony and the Court finds it to be credible. Based on this evidence, the Court finds that the officers obtained the voluntary consent of Brown prior to searching him and his car. Therefore, the only remaining question is whether the request to search Brown's vehicle and person violated Brown's constitutional rights.

---

[4] "The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or 'hunch.'" Id. at 7 (quoting Terry, 392 U.S. at 27). The Court considers the totality of the surrounding circumstances in determining whether the officer has a particularized and objective basis for suspecting criminal activity. United States v. Arvizu, 534 U.S. 266, 274 (2002).

Defendant cites two Tenth Circuit cases in which the court found that officers exceeded the scope of an initial traffic stop to question or search the occupants of the vehicle. See United States v. McSwain, 29 F.3d 558 (10th Cir. 1994); United States v. Guzman, 864 F.2d 1512 (10th Cir. 1988). In McSwain, 29 F.3d at 560, an officer stopped the defendant's vehicle to verify that a temporary license sticker was not expired. After checking the date of the temporary license and discovering that it was still valid, the officer began to question the defendant about his purchase of the vehicle and asked for identification and vehicle registration. A check of the defendant's identification revealed that the defendant's license was suspended and that he had a prior record for assaults and drug and gun violations. As a result, the officer continued to question the defendant and obtained consent to search the car. Id. at 560. The Tenth Circuit held that once the officer verified that the defendant's temporary license plate had not expired, the purpose of the initial stop expired and the officer exceeded the scope of the stop by further detaining and questioning the defendant. Id. at 561. While on first blush McSwain appears to be similar to the instant case, it differs significantly in that by the time the officer in McSwain began to question the defendant, he had already dispelled any reasonable suspicion or belief that the defendant had committed a traffic violation. Explaining the importance of this distinction, the Tenth Circuit noted,

> Though we have held in several cases that an officer conducting a routine traffic stop may inquire about identity and travel plans, and may request a driver's license and vehicle registration, run a computer check, and issue a citation, these cases-cited by the government-are inapposite. They all involve situations in which the officer, at the time he or she asks questions or requests the driver's license and registration, still has some objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring.

Id. (internal citations and quotations omitted).

7

The Sixth Circuit has clarified that asking for consent to search a vehicle, even after the conclusion of a legitimate detention, does not violate the Fourth Amendment as long as the request is reasonable under the specific facts of the case.  United States v. Burton, 334 F.3d 514, 517-18 (6th Cir. 2003); see also Ohio v. Robinette, 519 U.S. 33, 39 (1996) (holding that an officer did not exceed the scope or duration of a traffic stop, as governed by the Fourth Amendment reasonableness standard, by asking a detained motorist whether he would consent to a search of his automobile for contraband, even after the motorist had produced a valid driver's license and the officer had given him a verbal warning for speeding).  In other words, the test is whether further detention is reasonable under the circumstances, not whether the officers had reasonable suspicion that criminal activity is afoot.  As to the reasonableness of seeking consent to search a vehicle, the Sixth Circuit has quoted the following with approval:

> Questions that hold potential for detecting crime, yet create little or no inconvenience, do not turn reasonable detention into unreasonable detention. They do not signal or facilitate oppressive police tactics that may burden the public – for all suspects (even the guilty ones) may protect themselves fully by declining to answer. Nor do the questions forcibly invade any privacy interest or extract information without the suspects' consent.

United States v. Childs, 277 F.3d 947, 954 (7th Cir. 2002) (quoted in Burton, 334 F.3d at 518).

This case is in many respects similar to Burton, 334 F.3d at 515-16, at least with regard to the detention of Brown and the search of his vehicle.  In Burton, an officer received information, believed to be based on an anonymous tip, that two black men were selling drugs on a particular street.  Once on that street, the officer observed a car turn onto the street and come to a stop approximately ten feet away from a no parking sign and then saw two black men get into the back seat.  The officer approached the vehicle with his lights on and asked the driver to identify himself and produce his license.  After the driver gave the officer his license, the officer

asked him to step out of the car and began questioning him about ownership of the vehicle and about whether there was anything illegal inside. The officer then asked permission to search the car and the driver consented. During the search, the officer recovered a firearm. The driver later argued that the initial stop of the automobile was unlawful and that even if the officer did have a lawful basis to stop the vehicle, the officer exceeded the scope of the stop when he sought consent to search the car. The court found that the officer had probable cause to stop the vehicle for a traffic violation – parking in a no parking zone – and that searching the vehicle after receiving the consent of the driver did not exceed the scope of the search because under the circumstances, the officer's request for consent was <u>reasonable</u>. <u>Id</u>. at 517-19. As to the latter point, the court stated:

> In this case, after Burton gave Officer Davidson a valid driver's license, he was asked only a handful of questions, including whether he would consent to a search of the automobile. The record provides no reason to suspect either that these questions were unusually intrusive or that asking them made this traffic stop any more coercive than a typical traffic stop. . . . Particularly where, as here, the traffic stop took place on a street known to the police as a high-crime area, we believe that asking a few questions about illegal activity to the driver of an automobile stopped for a traffic violation at 11:30 p.m. is not unreasonable. We therefore conclude that the scope and duration of the traffic stop in this case was reasonable, which validates Burton's consent to search the automobile.

<u>Id</u>. at 518-19. In holding as such, the court expressly rejected the suggestion that an officer cannot request consent to search "absent reasonable suspicion that other criminal activity was afoot." <u>Id</u>. at 517; <u>see also</u> <u>United States v. Alva</u>, 106 Fed. App'x 314, 318 (6th Cir. Jul 20, 2004) (vacated on other grounds).


As stated above, the facts of the instant case closely resemble those of <u>Burton</u>. Here, the officers pulled Brown over for a traffic violation late at night in a high crime area. Then, *after*

(1) noticing that Brown appeared to be nervous, sweating, and breathing hard, (2) learning that Brown had a history of weapon offenses, and (3) observing Brown rooting around in the rear passenger compartment of his car, the officers asked for consent to search Brown and his car. Under the circumstances, the request was reasonable and did not violate Brown's Fourth Amendment Rights.

### III. CONCLUSION

For the reasons stated above, the physical evidence seized in connection with the frisk of Defendant Brown as well as the statements that Brown subsequently provided to the officers are admissible. Accordingly, Defendant Brown's Motion to Suppress (doc. 14) and Supplemental Motion to Suppress are **DENIED**.

IT IS SO ORDERED.

        ___s/Susan J. Dlott_____
        Susan J. Dlott
        United States District Judge